# UNITED STATES *v.* RUMELY.

No. 87.  Argued December 11–12, 1952.—Decided March 9, 1953.

*Oscar H. Davis* argued the cause for the United States. With him on the main brief was *Robert L. Stern,* then Acting Solicitor General. With him on a reply brief was *Solicitor General Cummings. Assistant Attorney General Murray, Beatrice Rosenberg* and *John R. Wilkins* were on both briefs.

*Donald R. Richberg* argued the cause for respondent. With him on the brief were *Alfons B. Landa* and *Delmar W. Holloman.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The respondent Rumely was Secretary of an organization known as the Committee for Constitutional Government, which, among other things, engaged in the sale of books of a particular political tendentiousness. He refused to disclose to the House Select Committee on Lobbying Activities the names of those who made bulk purchases of these books for further distribution, and was convicted under R. S. § 102, as amended, 52 Stat. 942, 2 U. S. C. § 192, which provides penalties for refusal to give testimony or to produce relevant papers "upon any matter" under congressional inquiry. The Court of Appeals reversed, one judge dissenting. It held that the committee before which Rumely refused to furnish this information had no authority to compel its production. 90 U. S. App. D. C. 382, 197 F. 2d 166. Since the Court of Appeals thus took a view of the committee's authority contrary to that adopted by the House in citing Rumely for contempt, we granted certiorari. 344 U. S. 812. This issue—whether the committee was authorized to

exact the information which the witness withheld—must first be settled before we may consider whether Congress had the power to confer upon the committee the authority which it claimed.

Although we are here dealing with a resolution of the House of Representatives, the problem is much the same as that which confronts the Court when called upon to construe a statute that carries the seeds of constitutional controversy. The potential constitutional questions have far-reaching import. We are asked to recognize the penetrating and pervasive scope of the investigative power of Congress. The reach that may be claimed for that power is indicated by Woodrow Wilson's characterization of it:

> "It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function." Wilson, Congressional Government, 303.

Although the indispensable "informing function of Congress" is not to be minimized, determination of the "rights" which this function implies illustrates the common juristic situation thus defined for the Court by Mr. Justice Holmes: "All rights tend to declare themselves

absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 355. President Wilson did not write in light of the history of events since he wrote; more particularly he did not write of the investigative power of Congress in the context of the First Amendment. And so, we would have to be that "blind" Court, against which Mr. Chief Justice Taft admonished in a famous passage, *Child Labor Tax Case,* 259 U. S. 20, 37, that does not see what "[a]ll others can see and understand" not to know that there is wide concern, both in and out of Congress, over some aspects of the exercise of the congressional power of investigation.

Accommodation of these contending principles—the one underlying the power of Congress to investigate, the other at the basis of the limitation imposed by the First Amendment—is not called for until after we have construed the scope of the authority which the House of Representatives gave to the Select Committee on Lobbying Activities. The pertinent portion of the resolution of August 12, 1949, reads:

> "The committee is authorized and directed to conduct a study and investigation of (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended to influence, encourage, promote, or retard legislation." H. Res. 298, 81st Cong., 1st Sess.

This is the controlling charter of the committee's powers. Its right to exact testimony and to call for the production of documents must be found in this language. The resolution must speak for itself, since Congress put

no gloss upon it at the time of its passage. Nor is any help to be had from the fact that the purpose of the Buchanan Committee, as the Select Committee was known, was to try to "find out how well [the Federal Regulation of Lobbying Act of 1946, 60 Stat. 839] worked." 96 Cong. Rec. 13882. That statute had a section of definitions, but Congress did not define the terms "lobbying" or "lobbying activities" in that Act, for it did not use them. Accordingly, the phrase "lobbying activities" in the resolution must be given the meaning that may fairly be attributed to it, having special regard for the principle of constitutional adjudication which makes it decisive in the choice of fair alternatives that one construction may raise serious constitutional questions avoided by another. In a long series of decisions we have acted on this principle. In the words of Mr. Chief Justice Taft, "[i]t is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." *Richmond Co.* v. *United States,* 275 U. S. 331, 346. Again, what Congress has written, we said through Mr. Chief Justice (then Mr. Justice) Stone, "must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity." *Lucas* v. *Alexander,* 279 U. S. 573, 577. As phrased by Mr. Chief Justice Hughes, "if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U. S. 22, 62, and cases cited.

Patently, the Court's duty to avoid a constitutional issue, if possible, applies not merely to legislation technically speaking but also to congressional action by way of resolution. See *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298. Indeed, this duty of not

needlessly projecting delicate issues for judicial pronouncement is even more applicable to resolutions than to formal legislation. It can hardly be gainsaid that resolutions secure passage more casually and less responsibly, in the main, than do enactments requiring presidential approval.

Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment. In light of the opinion of Prettyman, J., below and of some of the views expressed here, it would not be seemly to maintain that these doubts are fanciful or factitious. Indeed, adjudication here, if it were necessary, would affect not an evanescent policy of Congress, but its power to inform itself, which underlies its policy-making function. Whenever constitutional limits upon the investigative power of Congress have to be drawn by this Court, it ought only to be done after Congress has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits. Experience admonishes us to tread warily in this domain. The loose language of *Kilbourn* v. *Thompson,* 103 U. S. 168, the weighty criticism to which it has been subjected, see, *e. g.,* Fairman, Mr. Justice Miller and the Supreme Court, 332–334; Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, the inroads that have been made upon that case by later cases, *McGrain* v. *Daugherty,* 273 U. S. 135, 170–171, and *Sinclair* v. *United States,* 279 U. S. 263, strongly counsel abstention from adjudication unless no choice is left.

Choice is left. As a matter of English, the phrase "lobbying activities" readily lends itself to the construction placed upon it below, namely, "lobbying in its commonly accepted sense," that is, "representations made directly to the Congress, its members, or its committees," 90 U. S. App. D. C. 382, 391, 197 F. 2d 166, 175, and does not reach what was in Chairman Buchanan's mind, attempts "to saturate the thinking of the community." 96 Cong. Rec. 13883. If "lobbying" was to cover all activities of anyone intending to influence, encourage, promote or retard legislation, why did Congress differentiate between "lobbying activities" and other "activities . . . intended to influence"? Had Congress wished to authorize so extensive an investigation of the influences that form public opinion, would it not have used language at least as explicit as it employed in the very resolution in question in authorizing investigation of government agencies? Certainly it does no violence to the phrase "lobbying activities" to give it a more restricted scope. To give such meaning is not barred by intellectual honesty. So to interpret is in the candid service of avoiding a serious constitutional doubt. "Words have been strained more than they need to be strained here in order to avoid that doubt." (Mr. Justice Holmes in *Blodgett* v. *Holden,* 275 U. S. 142, 148, with the concurrence of Mr. Justice Brandeis, Mr. Justice Sanford and Mr. Justice Stone.) With a view to observing this principle of wisdom and duty, the Court very recently strained words more than they need be strained here. *United States* v. *C. I. O.,* 335 U. S. 106. The considerations which prevailed in that case should prevail in this.

Only a word need be said about the debate in Congress after the committee reported that Rumely had refused to produce the information which he had a right to refuse under the restricted meaning of the phrase "lobbying activities." The view taken at that time by the committee and by the Congress that the committee was au-

thorized to ask Rumely for the information he withheld is not legislative history defining the scope of a congressional measure. What was said in the debate on August 30, 1950, after the controversy had arisen regarding the scope of the resolution of August 12, 1949, had the usual infirmity of *post litem motam,* self-serving declarations.[1] In any event, Rumely's duty to answer must be judged as of the time of his refusal. The scope of the resolution defining that duty is therefore to be ascertained as of that time and cannot be enlarged by subsequent action of Congress.

Grave constitutional questions are matters properly to be decided by this Court but only when they inescapably come before us for adjudication. Until then it is our duty to abstain from marking the boundaries of congressional power or delimiting the protection guaranteed by the First Amendment. Only by such self-restraint will we avoid the mischief which has followed occasional departures from the principles which we profess.

The judgment below should be

*Affirmed.*

MR. JUSTICE BURTON and MR. JUSTICE MINTON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, concurring.

Respondent was convicted under an indictment charging willful refusal to produce records and give testimony before a Committee of the House of Representatives in violation of R. S. § 102, as amended, 52 Stat. 942, 2

---

[1] The ambiguity of the terms of the resolution—that is, whether questions asked to which answers were refused were within those terms—is reflected by the close division by which the committee's view of its own authority prevailed. The vote was 183 to 175.

U. S. C. § 192.[1] The Committee, known as the Select Committee on Lobbying Activities, was created on August 12, 1949, by House Resolution 298 [2] which provides in part as follows:

> "The committee is authorized and directed to conduct a study and investigation of (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended to influence, encourage, promote, or retard legislation."

Count one of the indictment charged that respondent willfully refused to produce records, duly subpoenaed, of the Committee for Constitutional Government (CCG), showing the name and address of each person from whom a total of $1,000 or more had been received by CCG from January 1, 1947, to May 1, 1950, for any purpose *including receipts from the sale of books and pamphlets.* Count six charged a similar offense as to a subpoena calling for the name and address of each person from whom CCG had received between those dates a total of $500 or more *for any purpose.* Count seven charged a willful refusal to give the name of a woman from Toledo who gave respondent $2,000 for distribution of The Road Ahead, a book written by John T. Flynn.

The background of the subpoena and of the questions asked respondent is contained in a report of the Select

---

[1] This section provides in pertinent part: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[2] H. Res. 298, 81st Cong., 1st Sess.

Committee, H. R. Rep. No. 3024, 81st Cong., 2d Sess. It appears that CCG and respondent, its executive, registered under the Regulation of Lobbying Act (60 Stat. 839, 2 U. S. C. §§ 261 *et seq.*) on October 7, 1946. The reports under this registration (which was made under protest) showed that CCG had spent about $2,000,000 from October 1946 to August 1950. The basic function of CCG, according to the Select Committee, was the "distribution of printed material to influence legislation indirectly." The Regulation of Lobbying Act requires disclosure of contributions of $500 or more received or expended to influence, directly or indirectly, the passage or defeat of any legislation by the Congress. 2 U. S. C. §§ 264, 266. The Select Committee reported that after enactment of the Regulation of Lobbying Act CCG adopted a policy of accepting payments of over $490 only if the contributor specified that the funds be used for the distribution of one or more of its books or pamphlets. It then applied the term "sale" to the "contribution" and did not report them under the Regulation of Lobbying Act. H. R. Rep. No. 3024, *supra,* pp. 1, 2.

The Report of the Select Committee also shows that while respondent was willing to give the Committee the total income of CCG, he refused to reveal the identity of the purchasers of books and literature because "under the Bill of Rights, that is beyond the power of your committee to investigate." *Id.,* p. 8. The books involved were The Road Ahead by John T. Flynn, The Constitution of the United States by Thomas J. Norton, Compulsory Medical Care and the Welfare State, by Melchior Palyi, and Why the Taft-Hartley Law by Irving B. McCann. Most of the purchasers (about 90 percent) had the books shipped to themselves; the rest told CCG the individuals to send them to or the type of person (*e. g.,* "farm leaders") who should receive them. One person had CCG send Com-

pulsory Medical Care by Melchior Palyi to 15,550 libraries.[3]

The Select Committee stated in its report:

"Our study of this organization indicates very clearly that its most important function is the distribution of books and pamphlets in order to influence legislation directly and indirectly. It attempts to influence legislation directly by sending copies of books, pamphlets, and other printed materials to Members of Congress. It attempts to influence legislation indirectly by distributing hundreds of thousands of copies of these printed materials to people throughout the United States.

"Of particular significance is the fact that Edward A. Rumely and the Committee for Constitutional Government, Inc., in recent years have devised a scheme for raising enormous funds without filing true reports pursuant to the provisions of the Federal Regulation of Lobbying Act. This scheme has the color of legality but in fact is a method of circumventing the law. It utilizes the system outlined above whereby contributions to the Committee for Constitutional Government are designated as payments for the purchase of books, which are transmitted to others at the direction of the purchaser, with both the contributor of the money and the recipients of the books totally unaware of the subterfuge in most cases." H. R. Rep. No. 3024, *supra,* p. 2.

---

[3] When the Taft-Hartley law was under discussion, CCG published a pamphlet "Labor Monopolies or Freedom" of which 250,000 copies were distributed. "All members of Congress got a copy. It went to publishers. People who could take opinion that way, and mint it into small coin to distribute to others." H. R. Rep. No. 3024, *supra,* p. 11. Respondent testified that Frank Gannett paid for that distribution.

The Select Committee insisted that the information demanded of respondent was relevant to its investigation of "lobbying activities" within the meaning of the Resolution. It said:

"Because of the refusal of the Committee for Constitutional Government, Inc., to produce pertinent financial records, this committee was unable to determine whether or not the Committee for Constitutional Government, Inc., is evading or violating the letter or the spirit of the Federal Regulation of Lobbying Act by the establishment of [a] class [of] contributions called 'Receipts from the sale of books and literature,' or whether they are complying with a law which requires amendments to strengthen it.

"The policy of the Committee for Constitutional Government, Inc., of refusing to accept contributions of more than $490 unless earmarked for books, etc., may also involve: (1) Dividing large contributions into installments of $490 or less, and causing the records of the Committee for Constitutional Government to reflect receipt of each installment on a different date, and/or causing the records of the Committee for Constitutional Government to give credit, for the several installments, to various relatives and associates of the actual contributor. (2) Causing the Committee for Constitutional Government's records as to 'Contributions' to reflect less than the total amount of contributions actually received, by labeling some part of such funds as payments made for printed matter.

"Because of the refusal of the Committee for Constitutional Government, Inc., to produce pertinent financial records, this committee was unable to determine whether or not the Federal Regulation of Lobbying Act requires amendment to prevent division of

large contributions into installments, or to prevent the crediting of contributions to others than the real contributor, or to prevent the use of other subterfuges." H.. R. Rep. No. 3024, *supra*, pp. 2–3.

The Select Committee submitted its report to the House (96 Cong. Rec. 13873) and offered a Resolution that the Speaker certify respondent's refusal to answer to the United States Attorney for the District of Columbia. *Id.*, p. 13881. The House adopted the Resolution, *id.*, p. 13893, and on August 31, 1950, the Speaker certified respondent's refusal to testify.

Respondent was convicted and sentenced to a fine of $1,000 and to imprisonment for six months. The Court of Appeals reversed by a divided vote (90 U. S. App. D. C. 382, 197 F. 2d 166), the majority holding that "lobbying activities" as used in the Resolution creating the Select Committee did not authorize the inquiries made of respondent. In its view the term "lobbying activities" meant direct contact with Congress, not attempts to influence public opinion through the sale of books and documents.

## I.

The Court holds that Resolution 298 which authorized the Select Committee to investigate "lobbying activities" did not extend to the inquiry on which this contempt proceeding is based. The difficulty with that position starts with Resolution 298. Its history makes plain that it was intended to probe the sources of support of lobbyists registered under the Regulation of Lobbying Act. Congressman Sabath, one of the sponsors of the Resolution, included CCG in a "partial list of some of the large lobby organizations and their reports of expenditures for the first quarter of 1949." See 95 Cong. Rec., p. 11386. The Regulation of Lobbying Act, under which respondent and CCG were registered, applies to all persons soliciting

or receiving money to be used principally "to influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." 2 U. S. C. § 266 (b). Congressman Buchanan, who introduced the Resolution and who became Chairman of the Select Committee, said that the purpose of the Resolution was to investigate the operations of that Act.[4] Not a word in the Resolution, not a word in the debate preceding its adoption suggests that the inquiry was to be delimited, restricted, or confined to particular methods of collecting money to influence legislation directly or indirectly.

The Select Committee took the same broad view of its authority.[5] It concluded that "all substantial attempts to influence legislation for pay or for any consideration constitute lobbying." H. R. Rep. No. 3239, 81st Cong., 2d Sess., p. 1. It said that "pamphleteering" was a lobbying activity that overshadows "the traditional techniques of contact and persuasion." *Id.*, p. 3. And it cited for its conclusion the activities of CCG. *Id.* This conclusion was reached over vehement objections by three minority members of the Select Committee who insisted that an investigation of that breadth exceeded the authority of the Resolution and infringed on the constitutional rights of free speech and free press. *Id.*, Part 2, p. 2.

---

[4] "Pressure groups interpret the Lobbying Act in different ways. Some file expenses. Others file full budget, but list expenditures they judge allocable to legislative activities. Still others file only expenditures directly concerned with lobbying.

"Some organizations argue they need not file unless principal purpose is influencing legislation. But Justice Department says, 'principal' includes all who have substantial legislative interests. Lobbies also differ on who filed expenditures—organizations or individuals." 95 Cong. Rec. 11389.

[5] An analysis of the scope of the investigation and the meaning of "lobbying" is contained in the General Interim Report of the Select Committee. H. R. Rep. No. 3138, 81st Cong., 2d Sess., pp. 5 *et seq.*

This was the posture of the case when the Select Committee referred respondent's refusal to testify to the House for contempt proceedings. Congressman Buchanan called the collection of funds through the sale of books and pamphlets an evasion of the Regulation of Lobbying Act. 96 Cong. Rec. 13882. He pressed on the House the importance of controlling that kind of activity in a regulation of lobbying. And he asked that the House ratify the conclusion of the Select Committee that respondent was in contempt. *Id.,* pp. 13886, 13887. That construction of the Resolution was challenged by Congressman Halleck, a member of the Select Committee who signed the minority report. He argued that the contempt citation sought had "nothing to do with the influencing of legislation in the ordinary ways of seeing Members of Congress or communicating with them. It has only to do with the formation of public opinion among the people of the country." *Id.,* p. 13888. Congressman Halleck's argument was twofold—that the inquiry was not within the purview of the Resolution and that, if it were, it would be unconstitutional. *Id.,* pp. 13887–13888. Others took up the debate on those issues. The vote was taken; and the Resolution passed. *Id.,* p. 13893.

Thus the House had squarely before it the meaning of its earlier Resolution. A narrower construction than the Select Committee adopted was urged upon it. Congressmen pleaded long and earnestly for the narrow construction and pointed out that, if the broader interpretation were taken, the inquiry would be trenching on the constitutional rights of citizens. I cannot say, in the face of that close consideration of the question by the House itself, that the Select Committee exceeded its authority. The House of Representatives made known its construction of the powers it had granted. If at the beginning there were any doubts as to the meaning of

Resolution 298, the House removed them. The Court is repudiating what the House emphatically affirmed, when it now says that the Select Committee lacked the authority to compel respondent to answer the questions propounded.

## II.

Of necessity I come then to the constitutional questions. Respondent represents a segment of the American press. Some may like what his group publishes; others may disapprove. These tracts may be the essence of wisdom to some; to others their point of view and philosophy may be anathema. To some ears their words may be harsh and repulsive; to others they may carry the hope of the future. We have here a publisher who through books and pamphlets seeks to reach the minds and hearts of the American people. He is different in some respects from other publishers. But the differences are minor. Like the publishers of newspapers, magazines, or books, this publisher bids for the minds of men in the market place of ideas. The aim of the historic struggle for a free press was "to establish and preserve the right of the English people to full information in respect of the doings or misdoings of their government." *Grosjean* v. *American Press Co.,* 297 U. S. 233, 247. That is the tradition behind the First Amendment. Censorship or previous restraint is banned. *Near* v. *Minnesota,* 283 U. S. 697. Discriminatory taxation is outlawed. *Grosjean* v. *American Press Co., supra.* The privilege of pamphleteering, as well as the more orthodox types of publications, may neither be licensed (*Lovell* v. *Griffin,* 303 U. S. 444) nor taxed. *Murdock* v. *Pennsylvania,* 319 U. S. 105. Door to door distribution is privileged. *Martin* v. *Struthers,* 319 U. S. 141. These are illustrative of the preferred position granted speech and the press by the First Amendment. The command that "Congress

shall make no law . . . abridging the freedom of speech, or of the press" has behind it a long history. It expresses the confidence that the safety of society depends on the tolerance of government for hostile as well as friendly criticism, that in a community where men's minds are free, there must be room for the unorthodox as well as the orthodox views.

If the present inquiry were sanctioned, the press would be subjected to harassment that in practical effect might be as serious as censorship. A publisher, compelled to register with the Federal Government, would be subjected to vexatious inquiries. A requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press. True, no legal sanction is involved here. Congress has imposed no tax, established no board of censors, instituted no licensing system. But the potential restraint is equally severe. The finger of government leveled against the press is ominous. Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the spectre of a government agent will look over the shoulder of everyone who reads. The purchase of a book or pamphlet today may result in a subpoena tomorrow. Fear of criticism goes with every person into the bookstall. The subtle, imponderable pressures of the orthodox lay hold. Some will fear to read what is unpopular, what the powers-that-be dislike. When the light of publicity may reach any student, any teacher, inquiry will be discouraged. The books and pamphlets that are critical of the administration, that preach an unpopular policy in domestic or foreign affairs, that are in disrepute in the orthodox school of thought will be suspect and subject to investigation. The press and its readers will pay a heavy price in harassment. But that will be minor in comparison with the menace of

58

the shadow which government will cast over literature that does not follow the dominant party line. If the lady from Toledo can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries, book stores, and homes of the land. Through the harassment of hearings, investigations, reports, and subpoenas government will hold a club over speech and over the press. Congress could not do this by law. The power of investigation is also limited.[6] Inquiry into personal and private affairs is precluded. See *Kilbourn* v. *Thompson,* 103 U. S. 168, 190; *McGrain* v. *Daugherty,* 273 U. S. 135, 173–174; *Sinclair* v. *United States,* 279 U. S. 263, 292. And so is any matter in respect to which no valid legislation could be had. *Kilbourn* v. *Thompson, supra,* pp. 194–195; *McGrain* v. *Daugherty, supra,* p. 171. Since Congress could not by law require of respondent what the House demanded, it may not take the first step in an inquiry ending in fine or imprisonment.

---

[6] Cf. *Barsky* v. *United States,* 83 U. S. App. D. C. 127, 167 F. 2d 241, certiorari denied, 334 U. S. 843, rehearing denied, 339 U. S. 971, and *Marshall* v. *United States,* 85 U. S. App. D. C. 184, 176 F. 2d 473, certiorari denied, 339 U. S. 933, rehearing denied, 339 U. S. 959.