UNITED STATES of America, Plaintiff-Appellee,

v.

Louis R. BEAM, Defendant-Appellant.

No. 81–1360.

United States Court of Appeals, Fifth Circuit.

Sept. 7, 1982.

---

Harry H. Walsh, III, (Court-appointed), Huntsville, Tex., for defendant-appellant.

Rebecca Gregory, Asst. U. S. Atty., Dallas, Tex., Joel Gershowitz, Atty., Washington, D. C., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Louis Beam appeals his conviction, following a bench trial, of the "petty offense" of violating a regulation of the Secretary of Agriculture, contrary to 16 U.S.C. § 551, by conducting and participating "in an assembly and special event" in the National Forest System without the permit required by 36 C.F.R. § 261.10(j). The referenced regulation provides, with respect to all lands in the National Forest System, that:

"The following are prohibited:

". . . .

"(j) Conducting, demonstrating, or participating in a public meeting, assembly, or special event, except as authorized by permit."

The evidence showed that on January 31 and February 1, 1981, Beam, then Texas Grand Dragon of the Ku Klux Klan, together with some twenty-four other Klansmen, camped out and conducted military-type training consisting of field maneuvers and classroom-style instruction, in the "undeveloped" Mesa Unit 31 of the LBJ National Grasslands, a part of the National Forest System, in Wise County, Texas.[1] No permit had been applied for or issued.

The Grasslands consist of approximately 20,000 acres and are open to the public. Some areas are "developed recreation sites," with camp sites and similar facilities, and others, such as the several thousand acre Mesa Unit, are in a more completely "natural" state. Official signs at all entrances to the Grasslands state, "Open to the Public, Hunting and Fishing Permitted Under State Fish and Game Regulations." These signs do not hint at the presence of

---

1. Beam's group was also accompanied by a television reporter, and two cameramen helping him, who filmed the events in question. The subsequent public broadcast of the film may have furnished the motivation for the instant prosecution. The reporter and cameramen were taken to and from the site by Beam blindfolded, because Beam wished to keep the location of the events secret so he could have future sessions there without being observed and possibly interfered with by members of the public. The reporter testified that he never did determine exactly where they had been and "my agreement with Mr. Beam was that I not know where we were." He also stated that Beam "didn't want a lot of spectators around while they were doing this." Beam's testimony confirmed the intention that these activities be conducted in private. There was no contrary evidence.

any restrictions.[2] Beam testified he was totally unaware that any kind of permit was required, and that shortly prior to the events in question he went to the local Ranger's office, gave his name and advised the secretary there that he and others "were going to camp out in the grasslands and be using them" and wanted "to know what the rules and regulations were governing the use." He did not otherwise elaborate on the intended use. The secretary, who normally furnished information to the public, gave Beam two maps and, when he asked if there was anything else, a copy of the Texas hunting and fishing regulations. She asked him no questions and did not advise him of the need for a permit; nor was such a need indicated by any of the documents furnished.

On appeal, Beam asserts that the regulation in question is unconstitutionally vague and standardless, that he lacked the necessary culpable state of mind and that, in any event, the regulation does not require a permit because the gathering and its associated activities were not public. The trial court, while not expressly addressing the first contention, rejected the other two as a matter of law, ruling that "willfulness, intent or knowledge is not a part of this regulation, and does not have to be proven by the government," and that "public" as used in the regulation applied only to "meeting" and not to "assembly" or "special event," because "the term 'public meeting' is inclusive of both public assemblies and public special events" and the court did

not favor a construction resulting in "excess and meaningless verbage."

We construe the regulation to require a permit only for those meetings, assemblies and special events that are public, and hence reverse Beam's conviction on this ground, without reaching his other contentions.

It is true, as the trial court observed, that if "public" modifies assembly and special event, as well as meeting, then the regulation contains excess and meaningless verbage. But this is *equally* the case if "public" modifies *only* meeting, for what "public meeting" would not be included within the term "assembly"? Thus, a presumption against redundancy affords no meaningful support to the trial court's construction.

In our view, the words "meeting," "assembly" and "special event" were not employed to denote three wholly discrete species of occurrence. Rather, these words all appear to be used primarily in an effort to cover an overall classification of occurrence while minimizing the risk of exclusion which might arise in various unforeseen specific applications if only one of the expressions had been present. Read in this light, the regulation says, in effect, that a permit is required if one conducts, demonstrates or participates in a public function, whether it be best described as a meeting, an assembly or a special event.[3]

Even if "meeting," "assembly" and "special event" were employed in a more individually distinct manner than that suggested above, this would not significantly mili-

2. A sign posted on a bulletin board in one of the "developed recreation sites" lists some forty-one different prohibited acts, including verbatim the above-set out paragraph (j) of 36 C.F.R. § 261.10. The bulletin board is not visible from the road one would normally take to the Mesa Unit 31. The district Ranger testified that this sign was also posted in his office, although a secretary who had been there for some nineteen months testified she had never seen the sign and was unaware of its existence.

This sign bears the title "Regulations for Occupancy and Use of *Developed Recreation Sites* On the National Forests Prohibit the Following Acts." (Emphasis added.) Under 36 C.F.R. § 261.14 there are a special set of prohibitions directed only to "Developed recreation sites."

The Mesa Unit 31 is not a "developed recreation site."

So far as the evidence shows there were no other signs, or material given or displayed to the general public at or about the Grasslands, advising of the requirement for a permit.

3. "Special event" may also have been thought necessary to include one taking part in a public performance arranged by another. While the gathering of those watching would constitute a public meeting or assembly, the mere performer could contend that he did not conduct or participate in such gathering; he would, however, be covered by the words "demonstrating . . . a public . . . special event."

tate against "public" modifying all of them. *Cf. Porto Rico Railway, L & P Co. v. Mor*, 253 U.S. 345, 348, 40 S.Ct. 516, 518, 64 L.Ed. 944, 946 (1920) (Brandeis, J.) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."). This construction is also supported by the absence of any article immediately before "assembly" or "special event." Had the intention been as suggested by the trial court, the very *minimally* sufficient wording most nearly corresponding to that appearing in the regulation would have been "participating in a public meeting, an assembly, or a special event." But as applied to the wording actually used, the trial court's construction would have "a" leapfrog "public" and twice reappear alone, without its previous companion, just before "assembly" (where it would become "an") and "special event." The more natural construction is that repetition of the entire phrase "a public" is implicit. It should not be necessary to expressly repeat that phrase three times in such a short sentence. To more adequately express the intention found by the trial court, the wording which next most nearly approximates that in fact employed would appear to be "participating in a public meeting, or an assembly or special event." Though this reflects the intention attributed by the trial court to the regulation's authors in a somewhat clearer manner than the foregoing example, it also deviates more from the actual wording. Not only is an article inserted just before "assembly" (though not "special event"), but the comma after "assembly" must be eliminated and an extra "or" added, thus structurally linking "assembly" and "special event" in a single unit distinct from "meeting," which is quite unlike the manner in which the regulation is in fact written. And, to express the supposedly intended thought with a normal level of clarity it would also be necessary to repeat the preposition "in" just before "an assembly" in the last example, thus deviating still farther from the regulation's actual wording and structure.

The government urges that "public" was employed so that the regulation would not cover every private "meeting." [4] The result of this construction is that, in the absence of a permit, private assemblies, but not private meetings, are prohibited. How is an individual—or a court, for that matter—to determine whether the private gathering in question is a "meeting" rather than an "assembly"? The government concedes that there is no substantial distinction. The words are at least occasionally listed as synonyms for each other. *See, e.g., Roget's International Thesaurus* (4th Ed. 1977) at 74.2; Rodale, *The Synonym Finder* (1978) at 72. Accordingly, to adopt the construction urged by the government is to render the regulation seriously vulnerable to constitutional attack on grounds of vagueness, as an enactment "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). Whether any particular private gathering is an assembly, rather than a meeting, is something which men of common intelligence must, in virtually all instances, necessarily guess at and differ in their conclusions concerning. Following recognized precepts of statutory interpretation, we should if at all possible avoid any construction, such as that ad-

---

**4.** Neither the trial court nor the government, nor the defendant, has suggested that "public" might modify both "meeting" and "assembly" but *not* "special event." We think it evident that no reasonable reading of the regulation is consistent with such a construction. Had this been intended, the comma between "meeting" and "assembly" would have been replaced with the word "or," and the article "a" placed just before "special event." The wording would have been "participating in a public meeting or assembly, or a special event, except as authorized by permit."

We also observe in this connection that most of the considerations noted elsewhere in this opinion as supportive of a construction applying "public" to "assembly" also support, though in some (but not all) instances less strongly, the application of "public" to "special event."

vanced by the government in this connection, which would raise serious questions as to the constitutional validity of the regulation. *See United States v. Rumely,* 345 U.S. 41, 45–47, 73 S.Ct. 543, 545–546, 97 L.Ed. 770, 775–76 (1953).

Moreover, the construction which we adopt avoids not only the virtually impossible task of differentiating meetings and assemblies, but also the serious lack of precision in distinguishing between gatherings of a few individuals, on the one hand, and meetings and assemblies on the other. The government does not seriously contend that four or five friends going hunting together in the Grasslands, or to read their poetry to each other there, must have a permit before doing so. The evidence demonstrates that the "permit" contemplated by the regulation is a written permit (Department of Agriculture Forest Service form FS 2700–3) which must be approved by the Lufkin, Texas, based Forest Supervisor for all National Forests and National Grasslands in Texas (amounting in all to approximately 700,000 acres), following written application and a processing period of one to three

months.[5] It is also clearly established that such small groups were not required to procure permits. For example, government witness Ranger Johnson, in charge of the LBJ Grasslands since 1976, testified that when he was in the Mesa Unit 31 on February 1, 1981, "there were several groups" using that portion of the Grasslands who did not, and were not required to, have permits. He also testified that a permit was not required to take a troop of some twenty Boy Scouts for a weekend of camping, classes on knot tying, first aid, and survival techniques to be used in the event of hurricanes or chemical or nuclear bombing, and exercises such as "double-timing" through the woods and splitting into two groups with one trying to locate the other. Johnson stated the same criteria would also apply to "a group other than the Boy Scouts" such as "just . . . a bunch of neighborhood kids doing the same thing."[6] Such an outing, whether by the local Boy Scout troop or the "neighborhood kids," can justly be described as both an assembly and a special event, as well as a meeting.[7]

---

5. 36 C.F.R. § 261.2(1) defines "permit" as "authorization in writing by a forest officer," as distinguished from "permission" which "means oral authorization by a forest officer." Section 261.2(k).

6. The government seems to suggest that groups (or at least "small" groups) of campers and hunters do not need a permit, regardless of whether they can be characterized as an assembly, because such activities are specially exempted from the section 261.10(j) permit requirement by the provision of 36 C.F.R. § 251.-50(c) that:

   "(c) The noncommercial temporary use or occupancy of National Forest System land or facilities by individuals for camping, picnicking, hiking, fishing, hunting, riding, boating, parking of vehicles and similar purposes is allowed without a special use authorization. . . ."

   However, by its plain terms such regulation is restricted to use or occupancy "by individuals." The co-author of this regulation, government witness William Boring, who was assistant director of the Lands unit in the Forest Service Washington office and had been a supervisory forester for thirty years, testified that this regulation applied only to individuals, not to groups, and likewise applied without differentiation to both developed and undeveloped sites.

He had no part in drafting section 261.10, and was basically unfamiliar with it.

7. Government witness Lannon, the Chief Forest Supervisor for all of Texas, who was charged with the approval of all Forest Service permits in the state, testified that a troop of twenty Boy Scouts camping "would be a special event," and *if* the camping were in an undeveloped area a permit would be required, though the same activity in a developed recreation site would not require a permit. The witness explained that this was because a regular fee was charged for use of developed sites, but not undeveloped areas. However, section 261.-10(j) makes no distinction between developed and undeveloped sites. This lack of distinction is not accidental, for section 261.10(i) specifically mentions "developed recreation site." While section 251.50(c) speaks of "sites having an established schedule of fees," it does so *only* to require the payment of those fees where the various uses authorized to "individuals" by that section take place on such sites; it in no way places greater conditions on the use of undeveloped than developed sites. There was no established schedule of fees for use of undeveloped sites, such as the Mesa Unit 31, in the LBJ Grasslands.

   Lannon also testified that four members of a hunting club hunting together in undeveloped

The government's construction thus inevitably leads to the serious difficulty of determining how large a gathering must be to constitute an assembly or special event. We think this difficulty may be largely avoided by construing the regulation to apply only to special events and assemblies which are public, that is, in general, open to members of the public at large as opposed to being confined to those sharing a common relationship antecedent to and apart from their participation in the particular assembly or special event. It is true that there will also be some difficulty in determining in particular cases whether or not a given occasion is "public." [8] But in our view this question is far more congenial to resolution by resort to objective and relatively clear-cut criteria, common understanding and established jurisprudence than is the question of how large must a gathering be before it becomes an assembly or special event. Moreover, the regulation requires that the "public" nature of a gathering be determined in any event, at least in the instance of meetings.

The government also contends that "it makes no sense to distinguish between private and public uses," as private ones may be equally as dangerous to public safety and as damaging to the National Forests. We reject this argument. The drafters of the regulation have expressly made this very distinction by employing the word "public." Moreover, the government's suggested parameters—danger to public safety and damage to the National Forests—cannot be read as fully consistent with its interpretation of the regulation. For example, a large nonpublic "meeting," which would not require a permit under the government's view, can be more damaging than a small public "meeting." Moreover, the regulations as a whole do not evince a consistently determinative and overriding concern for public safety, as an individual deer hunter (allowed to enter and hunt without a permit) almost certainly poses

more danger than a twenty-person church bible study group gathering for a private "assembly" (requiring a permit under the government's position). Finally, there is a rational basis for distinguishing between public and private functions, inasmuch as arguably the latter may be more accountable and self-controlled and less prone to general conflict or disturbance, by reason of the common bonds and greater mutuality of responsibility existing among the participants, than the former.

Further, the construction which we adopt is certainly not contrary to the manner in which the regulation has been administered, at least insofar as disclosed by this record. The record reflects that this is the first prosecution ever for use of National Forest land in Texas without a permit (nothing is disclosed in this regard respecting other states). The only "meeting, assembly, or special event" permits issued for the Grasslands from 1966 to the events in question were for dog club performances or bird dog trials, which were apparently public occasions. Government witness Lannon testified that in 1980 only six or seven such permits were issued in all of Texas, all for events such as dog trials or motorcycle races, which were presumably public. Lannon also testified that an important criteria in determining whether a permit was required was whether the occasion involved "a commercial exchange or anything like that." At no time were permits ever issued to the Boy Scouts, though it is evident from the testimony that they frequently used the National Forest lands in Texas, including the Grasslands. The evidence also showed that over the years several functions such as historical pageants, battle reenactments and paramilitary training exercises had been conducted on the Grasslands, most of them with the knowledge of the Forest Service but without any permit. There was no evidence that, prior to the events in question, any permit had ever been issued, denied or sought for private assemblies or

---

areas of the Grasslands would not constitute "an organized group" and hence would not require a permit.

8. And we do not intend in this opinion to lay down any all-inclusive definition of the term "public" as used in the regulation.

special events, such as discussions, lectures, ceremonial occasions, exercises, or any other nonpublic function of any church, civic or youth group, club or society, or any similar organization. Taken as a whole, the record does not establish that the regulation had been generally administered in a manner consistent with the interpretation urged by the government, and indeed strongly suggests the contrary. Moreover, the government has presented us with no legislative or administrative history indicating that this regulation was intended to require a permit for private assemblies or special events.

▮ Finally, we are dealing here with a criminal prosecution, where a sentence of up to six months' imprisonment may be imposed.[9] The statute authorizing the regulation in question is that which makes its violation a criminal offense and provides the penalty. 16 U.S.C. § 551. It is settled that in these circumstances we must construe the regulation no less strictly than we would a conventional criminal statute. See M. Kraus & Bros. v. United States, 327 U.S. 614, 621–22, 66 S.Ct. 705, 707–08, 90 L.Ed. 894, 898–99 (1946); United States v. Fisher, 456 F.2d 1143, 1145 (10th Cir. 1972).[10] Such statutes "are to be strictly .construed in favor of the accused," United States v. Resnick, 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127, 129 (1936), and their "provisions must be explicit and unambiguous in order to sustain a criminal prosecution." M.

Kraus & Bros. v. United States, 327 U.S. at 621, 66 S.Ct. at 707. Moreover, it has long been recognized that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) (citation omitted). See also Williams v. United States, —— U.S. ——, ——, 102 S.Ct. 3088, 3093, 73 L.Ed.2d 767 (1982). It cannot reasonably be disputed that, at the very least, there is ambiguity regarding whether this regulation requires a permit for private assemblies and special events. That being the case, in this criminal prosecution the ambiguity must be resolved in favor of lenity and we must hold that the regulation does not require a permit for such occasions.

We do not suggest that the government may not properly prevent, or condition on prior permit, the use of National Forests by private groups for activities such as paramilitary maneuvers,[11] or for other privately conducted functions. Our holding is simply that the regulation in question, employing the word "public," does not unambiguously do so.

The government does not contend, nor did the district court find, that the evidence is sufficient to establish that the activities in question constituted a public assembly or special event, and indeed such was not charged in the indictment. The testimony indicates this was not a public function.

9. Beam was sentenced to a fine of two hundred fifty dollars and six months' confinement, with execution of the confinement suspended during a ten-month probationary period.

10. This is true despite the fact that in a civil proceeding involving the same regulation, such as a declaratory judgment action or injunction suit, a less strict rule might apply. See North American Van Lines v. United States, 243 F.2d 693, 697 (6th Cir. 1957). Moreover, it is obvious that to be subject to the rule of strict construction it is not necessary that the regulation be so ambiguous or imprecise as to also be subject to challenge on void for vagueness grounds. Id.

11. Government witness Johnson testified that hunting and target practice are permitted on the Grasslands without a permit. So far as the

use of firearms was concerned, the activities in question all involved blank ammunition, with the possible exception of some brief target practice at the end. Johnson also stated that there was nothing he observed on the films of the activities in question that appeared improper, although he apparently believed that the group had used vehicles in a "closed vehicle area." If true, this would have been a violation of another regulation, but such was not charged. Government witness Lannon testified he saw nothing on the films "that constituted environmental damage" or violation of· state laws. There was evidence, however, that a relatively small amount of the "C rations" which the participants ate were not adequately buried.

Accordingly, Beam's conviction is reversed and the prosecution is ordered dismissed.

REVERSED.

JERRE S. WILLIAMS, Circuit Judge, dissenting:

I would affirm the district court and uphold the petty misdemeanor conviction of Beam for holding an assembly on public lands without obtaining a permit.

The opinion of the Court finds that in the wording of the regulation, "public" applies to an "assembly" and a "special event" as well as to a "meeting". The intricacy of its reasoning goes far beyond any required analysis of the meaning of a regulation when that regulation is intended for public application and which speaks openly to the public for itself. Such a regulation should not be interpreted and applied through an analysis so meticulous as to be worthy of a graduate English grammar text.

The finding by the Court that there is no difference between a public meeting and an assembly simply belies a pragmatic consideration of the facts of this very case. The Ku Klux Klan members most obviously were not participating in a public meeting. It is just as obvious that they were participating in an "assembly" for their own purposes. Meetings can consist of two people, can be chance encounters, can be quite informal; *see* the Merriam-Webster Third International Unabridged Dictionary. Hence the requirement of "public" meetings before the permit obligation arises. Assemblies are larger, formal, and planned, by definition. Hence no need for the "public" requirement.

The national convention of a political party is not a public meeting. It is clearly an assembly. Further, the kind of assembly involved in this case is an assembly which the public interest has a right to evaluate insofar as it has an impact on the use of public lands. If the assembly is a closed convention of pharmacists, or farmers, lawyers, former football players, or a large religious group, it raises questions about the use of the facility. And yet, none of these are "public meetings". These questions as to use, of course, have to do with possible intrusions upon the use of the lands by others, possible long term effects of the use, and possible illegal use, among others.

There is no issue in this case about whether or not a permit would have been refused. None was applied for. Refusal after full disclosure of the plans by the Klan would raise serious questions. But such questions are not here at issue. They were not placed at issue because of the obviously misleading nature of the statement made by Beam to the government official which was only to the effect that a group of people were planning a "camping" trip.

The majority opinion does not fully relate the facts. Here was a substantial group of men acting out battle maneuvers. A camp was set up with sentries securing a perimeter. The fact that the ammunition in the rifles which the men carried was blank would have been little solace to others who might have come upon these extraordinary maneuvers in their own tranquil use of public lands. At one time a sentry reported to the commander by radio that a stranger was approaching. He was instructed to turn the stranger away by telling him that the group was a local guard unit. This was not a camping trip. Nor was it a hunting trip by a few friends who come into the site together. This was an organized specific activity by a militant group which obviously constituted an assembly and raised questions about the effect its activities might have on lands which are owned by all of us and which others were entitled to use.

I am also concerned about that portion of the opinion for the Court which involves itself in the legislative policy behind this regulation by evaluating in detail the impact that various kinds and sizes of activities might have upon the public lands. Such an evaluation is not a function of the Court. There is no requirement that this regulation be perfect in that it insure that

all activities beyond a perfectly defined level of risk to the public lands and their use be subject to a permit and all activities below that level be free of a permit requirement. The regulator has the right to develop a regulation which will fill the desired function in approximate and pragmatic terms.

I do confess to a measure of concern about the fact that the record may reveal a laxity in the government's enforcing its permit requirement as to other assemblies. But certainly the record is not adequate to establish that there has been a deprivation of the rights of the defendant by failure to enforce the law with a completely even hand across the board. It is well established that someone in violation of law cannot escape on the ground that not everyone who has violated the law has been prosecuted—absent a bad faith prosecutorial intent to intrude upon the particular constitutional rights of the person prosecuted. *United States v. Rice,* 659 F.2d 524, 526 (5th Cir. 1981).

Yet even this concern about selective prosecution fades to a substantial extent in this case when a comparison is made between, on the one hand, a secret site organized as a military base and with its occupiers carrying rifles and engaging in military activities, and, on the other hand, a Boy Scout troop camping out and while doing so exploring such matters as first aid that go with life in the outdoors.

Finally, I do not find any requirement of guilty knowledge and guilty intent under this regulation or in the Constitution. *See United States v. Ayo-Gonzalez,* 536 F.2d 652 (5th Cir. 1976), *cert. denied,* 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977). Citizens are expected to know the laws under which they act. Anyone engaging in such a formal and organized use of public lands as

was Beam and the Ku Klux Klan in this case must be responsible for compliance with the requirements for such use. That Beam was being secretive in not disclosing the nature of the intended use is made very clear by his casual statement that he and a group of persons were going to "camp out". He cannot now claim, even if there were a "minimum" scienter requirement,[1] that he was caught unawares. He misdescribed what was contemplated to the public official to whom he made inquiry.

This is not a "great case" involving a complicated and detailed regulation of the Internal Revenue Service in which anyone intending to comply would expect to hire a lawyer and accountant to lead him through the maze. This is a simple regulation intended to be dealt with by the public. Without an intense consideration of how it might have been better drafted, it can most readily and simply be read as making a distinction between "public meetings" on the one hand and "assemblies" and "special events" on the other, as far as the "public" requirement is concerned. To hold that large or highly organized non-public assemblies, whatever their nature, are not subject to this regulation flies in the face of its obvious intent and purpose.

Holding these views, I must express my dissent.

---

[1]. In *United States v. Delahoussaye,* 573 F.2d 910, 912 (5th Cir. 1978), we held that in a conviction for hunting birds over baited land it need only be shown that the baiting could have been discovered by a hunter checking over the area for baiting. Note that this case placed the obligation upon the hunter just as Beam was under an obligation to know the regulation in view of the unusual use to which he and those

he "commanded" expected to subject the public land.