## UNITED STATES v. LATTIMORE.

### Cr. No. 1879–52.

United States District Court
District of Columbia.

May 2, 1953.

Leo A. Rover, U. S. Atty. for the District of Columbia, Washington, D. C., for plaintiff.

Thurman Arnold and Joseph C. O'Mahoney, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

On December 16, 1952, defendant Owen Lattimore was indicted on seven counts of

510

perjury alleged to have been committed before the Senate Internal Security Sub-committee, (hereinafter referred to as the Committee). On December 19, 1952, defendant entered a plea of not guilty to said indictment and was ordered to file all preliminary motions by February 16, 1953. Trial date was set for May 11, 1953.

Defendant filed ten motions.[1] Exhaustive written briefs were served and filed in connection therewith. On March 31 and April 1, 1953, oral arguments were heard on the motions for change of venue, for continuance and to dismiss the indictment and the various counts thereof. Arguments on the other motions were deferred pending determination of the motions herewith presented.

For an understanding of the charges against defendant and how they arose some background is necessary. Defendant, by many people, has been considered an expert in Far Eastern Affairs and a student of the problems of that part of the world. By others, he has been considered a Communist or fellow traveler. From 1934 to 1941, defendant was editor of the magazine, "Pacific Affairs".[2] For a time he was associated with the Office of War Information and the Pauley Reparations Commission.[3]

Charges against defendant were first investigated by a Subcommittee of the Senate known as the Tydings Committee. This Committee concluded there was no foundation to the charges against him.[4] Subsequently, in November, 1950, the Senate Judiciary Committee by Senate Resolution 366 (81st Congress, 2nd Session), was itself, or by means of a subcommittee, authorized to make an investigation and study of the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq., "the administration, operation and enforcement of other laws relating to espionage, sabotage and the protection of internal security of the United States" and "effects of subversive activities in the United States."

Upon being summoned by the Committee to appear before it in executive session, defendant was questioned concerning his past life and, more particularly, his association with the Institute of Pacific Relations and as editor of its magazine, "Pacific Affairs".[5] In July, 1951, the Committee conducted open hearings and questioned other witnesses. These hearings terminated in February, 1952. On February 26, 1952, defendant was permitted to testify before the Committee and made his statement a part of the record.[6] In the course of making his statement, defendant was questioned further. This portion of the hearings lasted thirteen days. It is apparent from the record of the hearings and the indictment that the Committee was interested, from its study of the records of the Institute of Pacific Relations, in finding out the extent to which the Institute of Pacific Relations may have been infiltrated or controlled by Communists or those connected with the Communist movement and what influence the Institute of Pacific Relations may have had on the foreign policy of the United States of America. In his testimony, defendant denied being a Communist, a member of the Communist Party, a Soviet spy or a fellow traveler.[7]

Apparently the Committee could discover no evidence from its investigation or

1. Motion for Inspection of Grand Jury Minutes, for Time to Prepare and File Motion for Change of Venue, for Bill of Particulars, for Leave to File Motion for Continuance, to Dismiss Indictment, three Motions for Production of Documents under Federal Criminal Rule 17(c), 18 U.S.C.A., and a Motion for Discovery and Inspection.

2. p. 59, Transcript of Oral Argument. Internal Security Subcommittee, Executive Session Testimony, July 13, 1951, at p. 6.

3. p. 15, Executive Session Testimony.

4. Report of the Committee on Foreign Relations. S.Rept. 2108. 81st Congress, 2nd Session. July 20, 1950.

5. Executive Session Testimony, Parts 9 and 10. Open Hearings, Internal Security Subcommittee, Feb. 26–Mar. 21, 1952.

6. Part 9, Hearings, p. 2898.

7. Part 9, Opening Hearings, p. 2947:
"All kinds of attempts have been made to depict me as a Communist or a Soviet agent. I have in fact been falsely identified as a fellow traveler, sympathizer,

the testimony of the various witnesses that defendant lied in denying that he was a Communist, a member of the Communist Party, a Soviet spy or a fellow traveler. This case therefore is unlike U. S. v. Remington, 2 Cir., 191 F.2d 246, where defendant was charged with perjury in denying that he was a member of the Communist Party, and U. S. v. Hiss, 2 Cir., 185 F.2d 822, where defendant was charged with lying in denying that he turned over to certain people important security documents.

In the indictment under consideration defendant is not charged with lying in denying that he was a Communist or a member of the Communist Party. The indictment here charges defendant with committing perjury as to his sympathics with Communism or Communist interests (count one); whether he had been told or knew certain persons were Communists (counts two and three); whether he had published certain articles in "Pacific Affairs" by Communists (count four); whether he had a luncheon engagement with Soviet Ambassador Oumansky in July, 1941 after the Hitler invasion (count five); that he did not at the request of Lauchlin Currie take care of his mail at the White House (count six); and whether he had made prearrangements with the Communist Party to get into Yenan (count seven).

It appears from the record and the hearings of the Committee that the charges reflected in the seven counts in the indictment related to a period of fifteen to twenty years before the hearings. With this factual background we will proceed to a consideration of the several motions presented to the Court.

### I.

#### Change of Venue.

Although defendant requested the privilege of making the motions for a change of venue and continuance at a later date, the Court ordered that the motions be argued at the hearing of the motions attacking the indictment. However, the motion to inspect the grand jury minutes, and the motions for production of documents and discovery were deferred to a date to be subsequently set by the Court should a hearing of these motions be deemed necessary by defendant.

■ A sufficient showing has not been made to justify a change of venue. Title 18, U.S.C.A., Federal Rules of Criminal Procedure, Rule 21(a) provides that a change of venue shall be granted:

"* * * if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division."

Charges against this defendant have received nation-wide publicity. Much has been written about this case pro and con since its inception. There is no indication or proof that defendant cannot have as fair and impartial trial here as in any other Federal Judicial District. This Court is not satisfied that "there exists in this district so great a prejudice against the defendant that he cannot obtain a fair and impartial trial." The motion for a change of venue is therefore denied. Dennis v. U. S., 84 App.D.C. 31, 171 F.2d 986; U. S. v. Eisler, D.C., 75 F.Supp. 634.

### II.

#### Motion for Continuance.

■ Defendant moves to continue the trial to a date not earlier than January, 1954. He bases his motion upon the decision in Delaney v. U. S., 1 Cir., 199 F.2d 107. But that case is clearly distinguishable from the instant case. In Delaney, defendant was indicted for certain crimes

---

or follower of the Communist line or promoter of Communist interests. Now I want to make my position clear. I am not interested in fine or technical distinctions. I am not interested in graduations or degrees of disloyalty. I have no use for fancy, legalistic distinctions. I am none of these things and never have been.

I am not and have never been a Communist, a Soviet agent, sympathizer, or any other kind of promoter of Communism or Communist interests, and all of these are nonsense. I so testified long ago, under oath before the Tydings subcommittee, and I do so again."

alleged to have been committed while he was Collector of Internal Revenue at Boston. He was removed from office. Shortly before the commencement of his trial certain hearings were held before a Congressional Committee involving charges against Delaney and his conduct while in office. Much publicity adverse to Delaney was given to those charges by radio, news services and the press. The Court of Appeals held that in view of this derogatory publicity at a time so near to the trial it was error not to grant another continuance. No such factual situation appears here. There is no evidence here that would warrant a continuance based on the holding in the Delaney case. In our own jurisdiction recently, Judge Matthews in a well written opinion discussed the applicability of the Delaney case in denying a motion for change of venue. U. S. v. Carper, 13 F.R.D. 483, 487, United States District Court for the District of Columbia, January 14, 1953. The Court stated that any apprehension of prejudice and inability to get a fair trial was "based upon conjecture and speculation." This the Court believes to be the situation in the case at bar.[8]

Therefore, although there is no justification for a continuance on the theory of the Delaney case, the Court feels that a reasonable continuance should be granted because of the amount of work that will be required in preparation for this case both by defendant and the Government. In fact, the Government made no objection to a continuance to early fall.

A number of additional motions are still to be argued and disposed of. The Court will require that all remaining motions be argued prior to June 1st and the case will be set down for trial on October 6, 1953. It is the Court's conclusion that the case should be tried at that time and that no further continuance should be granted.

## III.

### Motion to Dismiss Indictment.

The first ground upon which defendant relies to sustain his position as to the invalidity of the indictment is that it does not allege the name of the person who administered the oath to defendant. Defendant concedes that this is a technical point and voices the hope that the indictment be stricken down on the merits rather than on this technicality.[9] Since the argument on the motions, defendant's position on this point has been fortified by the recent decision of the Fifth Circuit, U. S. v. Debrow, 5 Cir., 203 F.2d 699, where the Court in a two to one decision struck down an indictment which failed to set forth the name of the Senator who administered the oath to certain defendants charged with perjury before a Committee of the Senate.

Perjury is defined in the District of Columbia by statute. The District of Columbia perjury statute,[10] as were many others,

---

8. See U. S. v. Moran, 2 Cir., 194 F.2d 623, for a discussion of unjustified apprehension of undue publicity.

9. See p. 97—defendant's brief in support of Motion to Dismiss.

10. 14 D.C.Code § 102
  "A person swearing, affirming, or declaring, or giving testimony in any form where an oath is authorized by law, is lawfully sworn, and will be guilty of perjury in a case where he would be guilty of said crime if sworn according to the forms of the common law."
  22 D.C.Code § 2501
  "Every person who, having taken an oath or affirmation before a competent tribunal, officer, or person, in any case in which the law authorized such oath or affirmation to be administered, that he

will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed is true, wilfully and contrary to such oath or affirmation states or subscribes any material matter which he does not believe to be true, shall be guilty of perjury; * * *."
  23 D.C.Code § 204
  "In every information or indictment to be prosecuted against any person for wilful and corrupt perjury, it shall be sufficient to set forth the substance of the offence charged upon the defendant, and by what court, or before whom the oath was taken (averring such court, or person or persons, to have a competent authority to administer the same) * * *."

was taken from the Act of 23 George, chap. 11. Title 23, D.C.Code, § 204 is almost word for word the same as R.S. § 5396 and former 18 U.S.C. § 558 since dropped from the Criminal Code. It may well be true that prior to the revision of the Code and adoption of the new Federal Rules of Criminal Procedure that the name of the person administering the oath was requir- ed to be set forth.[11]

██ However, the purpose of the new Federal Rules of Criminal Procedure was "to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimina- tion of unjustifiable expense and delay."[12] Furthermore Rule 52(a) provides that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Though this Court is not bound by the decision of the Fifth Circuit,[13] it nevertheless has carefully studied this opinion because of the defer- ence that should be accorded a decision of any Court of Appeals. However, it seems to this Court that the dissent of Judge Rives has much more persuasive quality than the majority opinion. As Judge Rives points out the "holding is extremely technical and is contrary to the letter and spirit of the pertinent Federal Rules of Criminal Procedure." The dis- senting Judge further aptly states that if this holding is to obtain "we are still en- meshed in the technicalities of common law pleading, and the new rules have failed of their purpose."

On April 29, 1953, in U. S. v. Young, 113 F.Supp. 20, United States District Court for the District of Columbia, Judge McGuire of our Court had occasion to de- cide this precise point. Judge McGuire in an excellently written opinion refused to follow the majority in the Debrow case, and for substantially the same reasons stated herein, held that an indictment was not fatally defective which did not set forth the name of the Senator who administered the oath.

██ The indictment here alleges the de- fendant was duly sworn before a competent tribunal in a matter in which an oath was authorized. Whether defendant was sworn or not and by whom is a matter of proof that may be readily determined at the prop- er time. It is held therefore the indict- ment in this case is not invalid because of the failure to allege the name of the Sena- tor administering the oath.

Defendant also contends that the indict- ment is invalid in its entirety because the questions and answers upon which the charges are based are immaterial as a mat- ter of law. Defendant vigorously argues that all the charges relate to ancient history and cannot possibly have any relevancy to the authorization under which the Com- mittee was making its investigation. In support of its position defendant relies strongly upon Bowers v. U. S., D.C.Cir., 202 F.2d 447.

██ Aside from the reasons of invalidi- ty as to certain counts as hereinafter ex- pressed, there is serious doubt in the Court's mind whether any count in this indict- ment can finally pass the test of materiali- ty. But the Court does not agree with the interpretation placed upon the Bowers case by defendant that it is necessary to plead in the indictment the particulars of mate- riality. The question of materiality like the question of pertinency is a question of law for the Court to decide when the Gov- ernment's evidence is in or at the conclu- sion of all the testimony. Such is the holding in the Bowers case.[14]

As the Court of Appeals there stated:

"While it was the duty of the trial court to determine as a matter of law whether the question was pertinent, that determination could only be made from a factual showing by the govern- ment, * * *. The United States

---

11. Markham v. U. S., 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed. 441; Hilliard v. U. S., 5 Cir., 24 F.2d 99.

12. Title 18, U.S.C.A., Federal Rules of Criminal Procedure, Rule 2.

13. District of Columbia v. American Ex- cavation Co., D.C., 64 F.Supp. 19; 21 C.J.S., Courts, § 198.

14. See also Sinclair v. U. S., 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692.

had the task of proving his guilt beyond a reasonable doubt, and a part of that task was to show the pertinency of the questions he refused to answer, *since pertinency was not apparent from the questions themselves. Some of the seven questions may well have been pertinent, and it might have been possible for the government to show pertinency. But the important fact is that it did not do so.*" [Emphasis supplied.]

Also squarely in point is the Meyers case in this jurisdiction.[15] The Court there said:

"Under the old system of criminal pleading it was customary to set forth in detail in a perjury indictment how and why the particular question addressed to the witness was material. * * * Assuming, without dec·'ling, that at common law such allegations were essential, the view of this Court is that such averments are no longer required under the new Federal Rules of Criminal Procedure. All that *is* indispensable now is a plain, concise and definite written statement of the essential facts that constitute the offense charged. There is an allegation in the indictment that the testimony sought to be elicited from the defendant was material to the inquiry. Whether it was is a matter of proof, and, of course, at the trial it will be necessary for the Government to establish the materiality of the subject matter. It is the view of this Court that under the new Rules, a general allegation of materiality is sufficient in an indictment for perjury or subornation of perjury." 75 F.Supp. at page 488.

The Court holds therefore that the issue of materiality is sufficiently set forth in the indictment.

Because the Court has concluded that it is not now in a position to dismiss the entire indictment, the motion to dismiss the indictment in its entirety must be overruled. However, in the Court's opinion certain counts in the indictment are fatally defective and the several counts will now be considered separately. In·order to determine the validity of the several. counts it is necessary at the outset to consider the scope and character of the Resolution of the Congress authorizing the investigation out of which the perjury charges arose. The pertinent part of the resolution reads:

"*Resolved,* That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities in the United States, its Territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence."

The Supreme Court of the United States has recently recognized "the penetrating and persuasive scope of the investigative power of Congress." In the Rumely case [16] Justice Frankfurter quoted Woodrow Wilson to illustrate "The reach that may be claimed for that power" as follows:

"'It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice and to embody the wisdom and will of its con-

15. U. S. v. Meyers, D.C., 75 F.Supp. 486, affirmed 84 App.D.C. 101, 171 F.2d 800, 11 A.L.R.2d 1, certiorari denied 336 U. S. 912, 69 ·S.Ct. 602, 93 L.Ed. 1076.

16. U. S. v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 544.

stituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function.' Wilson, Congressional Government, 303."

■ However, the Court points out that there are limitations to that power imposed by the Constitution such as, for example, in the First Amendment.[17] Similarly the Court of Appeals in the Bowers case recognizes the broad powers of Congress. It properly points out that "the questioning of witnesses customarily, and probably necessarily, takes a wide range. Committees may and do obtain vague information and receive hearsay evidence from which they form well-grounded suspicions that evils exist at which legislation should be aimed. That is to say, committees' conclusions that corrective legislation should be enacted need not be reached on the basis of relevant and pertinent evidence only." [202 F.Supp. 448.] It is significant that the Court goes on to point out that "The precision of court procedure

is not required. It may often be proper, justifiable and ultimately helpful in the accomplishment of its investigative purposes for a Congressional committee to address to witnesses questions which it cannot demonstrate to be pertinent. But in branding a refusal to answer as a misdemeanor, Congress was careful to provide that the question must be 'pertinent to the question under inquiry.'" So in a perjury case arising out of a Congressional investigation, which concededly may be broad in its scope as far as determining the necessity for corrective legislation is concerned, the element of materiality must be present or the charges fall.

### Count One

Having in mind the necessity of weighing the balance between the broad power of Congress to investigate and the protections afforded individuals by the Bill of Rights, as pointed out in Douds, and applying the rule to the indictment here, the Court is convinced that the first count is fatally defective. Under this count the defendant is charged with lying in denying that he had never been a sympathizer or promoter of Communism or Communist interests. It is based on a statement made by defendant to the Committee.[18]

■ First, this count is violative of the Sixth Amendment which protects the accused in the right to be informed of the nature and cause of the accusation against him.[19] The test has been laid down in

---

17. "President Wilson did not write in light of the history of events since he wrote; more particularly he did not write of the investigative power of Congress in the context, of the First Amendment." 345 U.S. at page 44, 73 S.Ct. at page 545.

See also U. S. v. Patterson, D.C.Cir., —— F.2d ——, where Judge Bazelon referring to the Rumely case in the Supreme Court of the United States stated: "The Court recognized the possible conflict between the 'power of Congress to investigate' and the 'limitation imposed by the First Amendment' * * *."

The test most widely accepted by the Courts is that any right granted or secured by the Constitution may not be restricted unless the exercise of that right constitutes a clear and present danger. Schenck v. U. S., 249 U.S. 47,

39 S.Ct. 247, 63 L.Ed. 470. See also Rumely, supra.

18. See footnote 7, supra.

19. The Sixth Amendment provides as follows:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

516

Sutton v. U. S., 5 Cir., 157 F.2d 661, where the Court held that the meaning of the Sixth Amendment was that the defendant:

"* * * be so fully and clearly informed of the charge against him as not only to enable him to prepare his defense and not be taken by surprise at the trial, but also that the information as to the alleged offense shall be so definite and certain that he may be protected by a plea of former jeopardy against another prosecution for the same offense." 157 F.2d at page 663.

■ Moreover this count does not meet the requirements of Rule 7(c) of the Federal Rules of Criminal Procedure which requires that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."[20]

■ Defendant in the first count is charged with lying in denying that he was a sympathizer or promoter of Communist interests. It seems to the Court that this charge is so nebulous and indefinite that a jury would have to indulge in speculation in order to arrive at a verdict. Sympathies and beliefs and what they mean to different individuals involve concepts that are highly nebulous and speculative at best. I presume a person could sympathize with a belief and yet still not believe. To probe the mind in a situation like this would give rise to nothing more than sheer speculation on the part of the prober. It is fundamental that a jury should not be asked to determine an issue which can be decided only on conjecture. It is clear to the Court therefore that the first count fails to met the test of definiteness required by the Sixth Amendment and Rule 7(c) of the Federal Rules of Criminal Procedure.

■ But there is another reason why count one is fatally defective. It is in conflict with the First Amendment.[21] It restricts the freedom of belief and expression which the Court in the Rumely case clearly points out is a limitation upon Congressional inquiry. In support of this count the Government cites the Barsky and Lawson cases in our Court of Appeals.[22]

In Barsky the appellant was indicted and convicted for willful failure to produce records (of the joint Anti-Fascist Refugee Committee relating to the receipt and disbursement of funds and correspondence with persons in foreign countries) before the House Committee on Un-American Activities. House of Representatives Resolution No. 5, 79th Congress, authorized the Committee to investigate the:

"* * * diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution."

The appellant contended the questions asked in response to the subpoena and the answers might reveal that he was a believer in Communism or a member of the Communist Party. The Court of Appeals held that the Committee was authorized to

20. In U. S. v. Fields, D.C., 6 F.R.D. 203, 204, the sufficiency of an indictment is stated to be:
   1. Whether the defendant, in the indictment, is apprised of the charge he is called upon to answer.
   2. Whether the charge is so stated that the defendant could successfully plead double jeopardy if an attempt were to be made to try him again on the same charge. See also Hagner v. U. S., 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861, affirming 60 App.D.C. 335, 54 F.2d 446, and U. S. v. Meyers, supra. The Meyers case also involved a perjury indictment under the D. C. Statute. For other perjury cases see Walker v. U. S., 8 Cir., 93 F.2d 792; Claiborne v. U. S., 8 Cir., 77 F.2d 682; Asgill v. U. S., 4 Cir., 60 F. 2d 776; Kovoloff v. U. S., 7 Cir., 202 F. 475.

21. The first amendment to the Constitution provides that:
   "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

22. Barsky v. U. S., 83 App.D.C. 127, 167 F.2d 241, 244; Lawson v. U. S., 85 App. D.C. 167, 176 F.2d 49.

make the investigation, that the resolution was not "too vague" and stated its conclusions as follows:

"We hold that in view of the representations to the Congress as to the nature, purposes and program of Communism and the Communist Party, and in view of the legislation proposed, pending and possible in respect to or premised upon that subject, and in view of the involvement of that subject in the foreign policy of the Government, Congress has power to make an inquiry of an individual which may elicit the answer that the witness is a believer in Communism or a member of the Communist Party. And we further hold that the provision we have quoted from House Resolution No. 5 is sufficiently clear, definite and authoritative to permit this particular Committee to make that particular inquiry. We hold no more than that." 83 App.D.C. at page 136, 167 F.2d at page 250.

In Lawson appellants were indicted and convicted of contempt of Congress for refusing to disclose whether or not they were or ever had been members of the Communist Party. The Court of Appeals said:

"So that there may be no mistake or misunderstanding and because the point here involved has proven to be one of constant recurrence, we expressly hold herein that the House Committee on Un-American Activities, or a properly appointed subcommittee thereof, has the power to inquire whether a witness subpoenaed by it is or is not a member of the Communist Party or a believer in Communism and that this power carries with it necessarily the power to effect criminal punishment for failure or refusal to answer that question under 2 U.S.C.A. § 192." 85 U.S.App.D.C. at page 170, 176 F.2d at page 52.

But these cases are distinguishable from the instant case. In the case at bar defendant is not charged with lying in denying that he believed in Communism or that he was a member of the Communist Party. In count one he is charged with falsifying the fact that he was a sympathizer and promoter of Communist interests.

The Government also relies heavily on the Douds case.[23] In that case the constitutionality of Section 9(h) of the National Labor Relations Act was before the Supreme Court. Section 9(h) required that an officer of a union seeking to invoke the machinery of the act must submit an affidavit [commonly known as the "Non-Communist Affidavit"] that:

"* * * he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches the overthrow of the United States Government by force or by any illegal or unconstitutional methods. [29 U.S.C.A. § 159(h).]"

Three Justices did not participate in the decision. The remaining six Justices split three to three on the question whether the Non-Communist Affidavit requirement conflicted with the freedom of beliefs protection of the First Amendment.

Aside from that, however, the case is clearly distinguishable. Chief Justice Vinson speaking for the three Justices upholding the validity of the requirement of the Non-Communist Affidavit by union leaders indicated the presence in that case of the manifestation of overt acts. The Chief Justice stated that "courts cannot 'ascertain the thought that has had no outward manifestation.'"[24] The Court discussed the obstructions to the free flow of commerce caused by strikes and other industrial unrest; that there was substantial evidence of obstructive strikes. All through the majority opinion the thought is stressed that what was being suppressed were overt acts which were obstructions to the free flow of commerce and that no attempt was being

23. American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 677, 94 L.Ed. 925.

24. American Communications Ass'n v. Douds, supra, 339 U.S. at page 411, 70 S.Ct. at page 690.

518

made to prevent dissemination of Communist doctrine.

Involved in the first count in the case at bar is merely a speculation into the uncertainties of the human mind. No overt acts could possibly emerge from this count such as existed in the Douds case. No case has been pointed out to the Court which sustains a perjury count based on the speculative·fathoming of the mind that will be necessary by the trier of fact in order to arrive at a decision under count one of the indictment.

In the discussion on beliefs in the Douds case, Justice Frankfurter stated:

"I cannot deem it within the rightful authority of Congress to probe into opinions that involve only an argumentive demonstration of some coincidental parallelism of belief·with some of the beliefs of those who direct the policy of the Communist Party, though without any allegiance to it. To require oaths as to matters that open up such possibilities invades the inner·life of men whose compassionate thought or doctrinaire hopes may be as far removed from any dangerous kinship with the Communist creed as were those of the founders of the present orthodox political parties in this country." 339 U.S. at page 422, 70 S.Ct. at page 696.

Justice Jackson in the same case also pointed out the problem by stating that a trial for false swearing concerning beliefs would "revolve around the conjecture as to whether he [the one making the affidavit] candidly exposed his state of mind." He suggested that the intent and beliefs are determined by the Courts as incidental to deciding the legal effect to be given to overt acts.

Time and time again the Supreme Court has emphasized the freedom under the First Amendment to have opinions and sympathies, unexpressed by overt·acts that show a clear and present danger to the Constitutional form of government guaranteed by the Constitution. Schenck v. U. S., supra. Criminal sanctions cannot be im-posed where we hold "beliefs and opinions concerning domestic measures and trends in national and world affairs." Taylor v. Mississippi, 319 U.S. 583, 590, 63 S.Ct. 1200, 1204, 87 L.Ed. 1600.

In West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 the Court aptly said:

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." 319 U.S. at page 642, 63 S.Ct. at page 1187.

The First Amendment protects an individual in the expression of ideas though they are repugnant to the orthodox. Communism's falacy and viciousness can be demonstrated without striking down the protection of the First Amendment of discourse, discussion and debate. When public excitement runs high as to alien ideologies, is the time when we must be particularly alert not to impair the ancient landmarks set up in the Bill of Rights. "The greater the importance of safeguarding the community·from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.[25]

If we weaken the safeguards afforded under the Bill of Rights we impair our position with the democratic forces in the world fighting against the tyranny of Communism. "Safety of society depends on the tolerance of government for hostile as well as friendly criticism, that in a community

25. De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278.

where men's minds are free, there must be room for the unorthodox as well as the orthodox views." [26]

In our proper concern for the internal and external threat of Communism and in pursuing our efforts to strike down this threat, we should endeavor to be consistent and not attempt to require a conformity in thought and beliefs that has no relevancy to a present danger to our security. During the past few years the experts have had many conflicting and divergent views on foreign policy. Many thoughtful people and patriotic American citizens in 1938 and 1939 were not enthusiastic about our getting into the war. Violent changes in the thinking of our people occurred in a short period of time before and after Germany broke with Russia. "Attempts of the courts to fathom modern political meditations of an accused would be as futile and mischievous as the efforts in the infamous heresy trials of old to fathom religious beliefs. * * * It is true that in England of olden times men were tried for treason for mental indiscretions ·such as imagining the death of the king. But our Constitution was intended to end such prosecutions. Only in the darkest periods of human history has any Western government concerned itself with mere belief, however eccentric or mischievous, when it has not matured into overt action; and if that practice survives anywhere, it is in the Communist countries whose philosophies we loathe." [27]

Applying these guiding principles to count one, this count must fall because it is violative of both the First and Sixth Amendments.

### Counts Three and Four

▆▆▆ Count three charges that defendant perjured himself when he said he did not know that Asiaticus was a Communist. Count four charges defendant perjured himself when he stated that he, while editor of "Pacific Affairs", had not published articles by persons whom he knew

to be Communists (other than Russian contributions). The question of knowledge, that is, the concept of what defendant knew is even more nebulous than sympathies. What he could have meant when he said he did not "know" gives rise to speculation and conjecture, but speculation cannot be substituted for proof "beyond a reasonable doubt" because the plain meaning of the word "reason" excludes conjecture. Defendant is the only person who will ever know what he meant when he said that he did not know that Asiaticus was a Communist. Who can say whether he meant that he did not "believe" or "suspect" or "feel" or "have reason to think". Any one or all of these still might not constitute knowledge within his own mind. Under these counts there can be no overt acts as the outward expressions of the mind as were present in the Douds case.

The arguments against the validity of count one are even stronger when applied to counts three and four. Counts three and four must also be stricken down as violative of the First and Sixth Amendments.

### Count Seven

▆▆▆ Count seven is clearly defective in its plain inconsistency and indefiniteness. It charges defendant with lying when he stated that neither he nor anyone in his party made any prearrangements with the Communist Party in order to get into Yenan. The Government charges that the true fact was that arrangements had been made with *Communist authorities* [emphasis supplied]. It seems plain that defendant testified about arrangements with the Communist Party and getting beyond the line of demarcation when the Government claims the perjury involved arrangements with Communist authorities and being received at Communist Headquarters. This constitutes a fatal variance that fails to meet the requirements of the Sixth Amendment and Rule 7(c) of the Federal Rules of Criminal Procedure. This count cannot be cured by a bill of particulars. The

---

26. Rumely, supra, Douglas, J. concurring 345 U.S. at page 57, 73 S.Ct. at page 551.

27. Douds, supra, Jackson, J. dissenting in part, 339 U.S. at page 437, 438, 70 S.Ct. at page 703.

prosecutor cannot be substituted for a Grand Jury in helping to revive what constitutes a fatal indictment. Jarl v. U. S., 8 Cir., 19 F.2d 891.

#### Counts Two, Five and Six

As the Court previously indicated there is serious doubt whether the remaining counts two, five and six can ultimately pass the test of materiality so as to present a jury issue. But this must await the trial.

The motion to dismiss counts two, five and six is therefore denied, without prejudice to renew the motion at the time of trial.

#### IV.

#### Bill of Particulars

The granting of a bill of particulars rests in the sound discretion of the Court. McMullen v. U. S., 68 U.S.App. D.C., 302, 96 F.2d 574.

The Federal Criminal Rules provide:

"(f) Bill of Particulars. The court for cause may direct the filing of a bill of particulars. A motion for a bill of particulars may be made only within ten days after arraignment or at such other time before or after arraignment as may be prescribed by rule or order. A bill of particulars may be amended at any time subject to such conditions as justice requires." [Title 18, U.S. C.A., Federal Rules of Criminal Procedure, Rule 7(f)].

It must not be used as a fishing expedition. U. S. v. Kushner, 2 Cir., 135 F.2d 668.

It is proper in perjury cases of this type to require the Government to disclose the overt acts on which it relies to sustain the charge. U. S. v. Remington, supra. The allegations in counts two, five and six are so indefinite that the Court feels the defendant is entitled to a bill of particulars giving him certain information as to enable him to defend. Therefore the Court orders that the Government file a bill of particulars giving information as to counts two, five and six as follows:

*As to Count Two:* The Government should state the overt acts upon which it relies to show that the defendant had been told that Chi was a Communist. The word "Communist" should be defined as used here. The persons who told defendant that Chi was a Communist should be identified and the time, place and circumstances under which defendant was told this.

*As to Count Five:* The overt acts should be stated upon which the Government intends to rely to show that defendant perjured himself in stating that the luncheon with Oumansky was not held after the Hitler invasion of Russia and just before the defendant went out to China.

*As to Count Six:* The Government should state the overt acts on which it relies in proving that defendant perjured himself in saying that he had not, at Currie's request, taken care of Currie's mail at the White House while Currie was away.

In other respects the motion for a bill of particulars as to these counts should be denied.

#### APPENDIX

#### Count I

The Grand Jury charges:

1. On or about February 27, 1952, in the District of Columbia and within the jurisdiction of this Court, Owen Lattimore, the defendant herein, having duly taken an oath before a competent tribunal, to wit, the Subcommittee to Investigate the Administration of the Internal Security Act and other Internal Security Laws, of the Committee on the Judiciary of the United States Senate, a duly created and authorized Subcommittee of the United States Senate conducting official hearings in the District of Columbia, and inquiring in a matter then and there pending before the said Subcommittee in which a law of the United States authorizes an oath to be administered, that he would testify truly, did unlawfully, wilfully and knowingly, and contrary to said oath, state a material matter which he did not believe to be true, that is to say:

2. That at the time and place aforesaid, the said Senate Subcommittee, inquiring as aforesaid, was conducting a study and investigation of the administration, operation and enforcement of laws relating to

espionage, sabotage, and the protection of the internal security of the United States, and of the extent, nature, and effects of subversive activities in the United States; including but not limited to the extent to which the Institute of Pacific Relations was infiltrated and influenced or controlled by agents of the Communist world movement; the extent to which these agents and their sympathizers worked through the Institute into the United States Government to the point where they exerted influence on the United States Far Eastern policy, and the extent to which they still exert such influence; and the extent to which such agents and their sympathizers misled American public opinion, particularly with regard to Far Eastern policy.

3. That it was material to the study and investigation to ascertain the extent to which the Institute of Pacific Relations had been infiltrated and influenced by agents of the Communist world movement and their sympathizers and the extent to which any of these persons had exerted influence on United States Far Eastern policy from posts they secured in the United States Government, or had influenced American public opinion with reference to said policy; and what participation in or knowledge of any such situation described above was had by Owen Lattimore, who had been an important figure in the Institute of Pacific Relations, and editor of one of its official publications, "Pacific Affairs", and who had been an official of the United States Government; and it was further material to ascertain whether Lattimore himself had been a promoter of Communism or Communist interests.

4. That at the time and place aforesaid, the defendant, Owen Lattimore, duly appearing as a witness before the said Senate Subcommittee, and then and there being under oath as aforesaid, testified falsely before the said Senate Subcommittee with respect to the aforesaid material matter, to wit, said defendant testified that he had never been a sympathizer or any other

kind of promoter of Communism or Communist interests.[1]

5. That the aforesaid testimony of that defendant, as he then and there well knew and believed, was untrue, in that said defendant had been a sympathizer and promoter of Communism and Communist interests. [22 D.C.Code 2501]

### Count II

The Grand Jury further charges:

1. On or about July 13, 1951, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee, and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter as is more fully set forth in Paragraph 3 of Count I herein, the allegations of which are hereby repeated and realleged herein; and it was further material to ascertain whether said defendant knew prior to 1950 that Ch'ao Ting Chi was a Communist.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee, testified falsely with respect to the aforesaid material matters, as follows:

(Referring to Ch'ao Ting Chi)

"Senator Ferguson: And you had no reasons to believe that he could be a Communist?

"Mr. Lattimore: No.

"Mr. Morris: Had anyone ever told you he was a Communist?

"Mr. Lattimore: No."[2]

"Mr. Morris: Had anyone ever told you that Dr. Chi was a Communist?

"Mr. Lattimore: No.

"Mr. Morris: When did you learn that Dr. Chi was a Communist?

"Mr. Lattimore: I learned from the newspapers that sometime perhaps in

---

1. P. 2947, Senate Internal Security Subcommittee Hearings.

2. P. 155 Executive Session Testimony, Senate Internal Security Subcommittee.

1950 he had taken service under the Chinese Communist government."[3]

4. That the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue, in that said defendant had been told prior to 1950 that Ch'ao Ting Chi was a Communist. [22 D.C.Code 2501]

## Count III

The Grand Jury further charges:

1. On or about July 13, 1951, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee, and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter as is more fully set forth in Paragraph 3 of Count I here, the allegations of which are hereby repeated and realleged herein; and it was further material to ascertain whether said defendant knew that a person using the pseudonym of "Asiaticus," in whose name articles were published in "Pacific Affairs", an official publication of the Institute of Pacific Relations, was a Communist.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee, testified falsely with respect to the aforesaid material matter, as follows:

"Mr. Morris: Can you recall that you commended Mr. Carter on the selection of Asiaticus on that inquiry?

"Mr. Lattimore: I can't recall it.

"Mr. Morris: You do not recall that?

"Mr. Lattimore: I wouldn't have been at all surprised. I thought he was a good economist who knew economic conditions in China pretty well.

3. P. 80 Executive Session Testimony, Senate Internal Security Subcommittee.

4. P. 90, Executive Session Testimony, Senate Internal Security Subcommittee.

"Mr. Morris: And it is your testimony that you did not know he was a Communist?

"Mr. Lattimore: I didn't know he was a Communist. I would have said, speaking of the late 1930's that I would have thought he was possibly a Socialist, but not a Communist."[4]

4. That the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue, in that said defendant in the late 1930's knew that "Asiaticus" was a Communist. [22 D.C.Code 2501]

## Count IV

The Grand Jury further charges:

1. On or about February 29, 1952, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee, and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter as is more fully set forth in Paragraph 3 of Count I herein, the allegations of which are hereby repeated and realleged herein; and it was further material to ascertain whether when said defendant was Editor of "Pacific Affairs", an official publication of the Institute of Pacific Relations, he published and caused to be circulated articles by persons whom said defendant knew to be Communists.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee, testified falsely with respect to the aforesaid material matter as follows:

"Mr. Morris: When you were editor of the publication "Pacific Affairs" did you ever publish an article by a person whom you knew to be a Communist?

"Mr. Lattimore: Apart from Russian contributions, no."[5]

5. P. 3125, Senate Internal Security Subcommittee Hearings.

4. That the aforesaid testimony of said defendant as he then and there well knew and believed, was untrue, in that said defendant had, when editor of "Pacific Affairs", published articles (other than Russian contributions) by persons whom he knew to be Communists. [22 D.C.Code 2501]

#### Count V

The Grand Jury further charges:

1. On or about July 13, 1951, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter as is more fully set forth in Paragraph 3 of Count I herein; the allegations of which are hereby repeated and realleged herein; and as it was further material to ascertain whether a conference between said defendant and the Soviet Ambassador to the United States, Constantine Oumansky, had taken place before or after the Hitler invasion of the Soviet Union on June 22, 1941.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before the said Senate Subcommittee, testified falsely with respect to the aforesaid material matter, as follows:

"Mr. Lattimore: My third meeting was just before I went out to Chungking as the Generalissimo's adviser when Mr. Carter invited Mr. Oumansky and me to have dinner with him in a hotel here in Washington.

"Mr. Morris: What year was that?

"Mr. Lattimore: That was 1941.

"Mr. Morris: What month in 1941?

"Mr. Lattimore: It was just before I went out, so it must have been early July 1941.

"Mr. Morris: That was therefore after the Hitler invasion of the Soviet?

"Mr. Lattimore: Yes." [6]

4. That the aforesaid testimony of the defendant, as he then and there well knew and believed, was untrue, in that the luncheon conference between him and the Soviet Ambassador was held while the Hitler-Stalin Pact was still in effect, and before the Hitler invasion of the Soviet Union on June 22, 1941. [22 D.C.Code 2501]

#### Count VI

The Grand Jury further charges:

1. On or about July 13, 1951, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee, and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter, as is more fully set forth in Paragraph 3 of Count I herein, the allegations of which are hereby repeated and realleged herein; and it was further material to ascertain whether the defendant handled correspondence of Lauchlin Currie, the Administrative Assistant to the President of the United States, while said Lauchlin Currie was away.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee testified falsely with respect to the aforesaid material matter, as follows:

"Mr. Morris: Tell me this, Mr. Lattimore: Is it your testimony that you did not at the request of Lauchlin Currie take care of his mail at the White House while he was away?

"Mr. Lattimore: That certainly is my statement." [7]

4. That the aforesaid testimony of said defendant, as he then and there well knew

---

6. Pp. 36–7, Executive Session Testimony, Senate Internal Security Subcommittee.

7. P. 26, Executive Session Testimony, Senate Internal Security Subcommittee.

and believed, was untrue, in that said defendant had been requested to and did in fact so take care of correspondence of said Lauchlin Currie while said Currie was away. [22 D.C.Code 2501]

### Count VII

The Grand Jury further charges:

1. On or about July 13, 1951, and at the place aforesaid, as is more fully set forth in Paragraphs 1 and 2 of Count I herein, the allegations of which (except the date) are hereby repeated and realleged herein, Owen Lattimore, the defendant herein, appearing as a witness before the said Senate Subcommittee, and being under oath, as aforesaid, testified falsely as to a material matter.

2. Said false testimony was as to a material matter, as is more fully set forth in Paragraph 3 of Count I herein, the allegations of which are hereby repeated and realleged herein; and it was further material to ascertain the circumstances of the defendant's trip to and reception at Chinese Communist Headquarters at Yenan, China.

3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee, testified falsely with respect to the aforesaid material matter, as follows:

"Mr. Morris: And before you went beyond that line of demarcation, it would be necessary to have the Communist authorities' permission, isn't that right?

"Mr. Lattimore: No.

\* \* \* \* \* \*

"Mr. Morris: Is it your testimony that you or anybody in your party did not make any prearrangement with the Communist Party in order to get in?

"Mr. Lattimore: None whatever." [8]

4. That the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue, in that before being received at Communist Headquarters in Yenan, said defendant and persons in his party had made prearrangements with the Communist authorities. [22 D.C.Code 2501]

8. Pp. 70-1, Executive Session Testimony, Senate Internal Security Subcommittee.